# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

MAR 0 8 2007

BARBARA E. WHITE, )
)
    Plaintiff, ) Civil Action No. 1:05cv00090
)
v. ) **MEMORANDUM OPINION**
)
MICHAEL J. ASTRUE, ) By: Glen M. Williams
**Commissioner of Social Security,**[1] ) Senior United States District
) Judge
    Defendant. )

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Barbara E. White, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying White's claims for disability insurance benefits, ("DIB"), disabled widow's benefits, ("DWIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 402(c), 423, 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that White protectively filed her applications for DIB and SSI on or about September 23, 1998, alleging disability as of March 15, 1998, due to neck and back problems, arthritis and dizziness. (Record, ("R"), at 87-90, 98-103, 485-87.) The claims were denied initially and upon reconsideration. (R. at 488-94.) On March 22, 1999, White requested a hearing before an administrative law judge, ("ALJ"). (R. at 66.) On August 24, 1999, prior to the hearing before the ALJ, White filed her applications for DWIB. (R. at 495-96.) The ALJ held a hearing on October 1, 1999, at which White was represented by counsel. (R. at 500-28.) At the conclusion of the hearing, the ALJ stated that the record would remain open for 30 days to allow White to present additional psychological evaluations. (R. at 527-28.) On February 11, 2000, the ALJ issued an opinion explaining his findings as to White's claims. (R. at 39-45.) Among other things, the ALJ found that White had

Case 1:05-cv-00090-GMW-PMS   Document 14   Filed 03/08/07   Page 2 of 40   Pageid#: 46

the residual functional capacity to perform medium work,[2] and also found that White was not under a "disability" as defined by the Act, at any time through the date of the decision. (R. at 45.)

Following the ALJ's decision, White pursued her administrative appeals and sought review of the decision by the Appeals Council. (R. at 35.) On April 10, 2003, the Appeals Council granted White's request for review and then vacated the ALJ's decision and remanded[3] this case for further administrative proceedings. (R. at 79-82.) The Appeals Council noted that White filed subsequent claims for DIB, SSI and DWIB on November 30, 2001.[4] (R. at 81.) The Appeals Council found that the newly filed claims were merely duplicates of the claims already before them; thus, the Appeals Council determined that the ALJ would issue a new decision on the associated claims. (R. at 81.) As a result, a second hearing was held before the ALJ on October 27, 2003, at which White was represented by counsel. (R. at 529-51.) On December 24, 2003, the ALJ issued an opinion explaining his findings as to White's claims. (R. at 19-26.)

---

[2] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she can also do light work or sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[3] The Appeals Council remanded this case in order to resolve the following issues: (1) the hearing tape could not be located; therefore, the record was incomplete; and (2) at the first hearing, the vocational expert evidence was apparently used in evaluating the exertional and skill requirements of White's past relevant work and, presumably, in assessing her ability to return to such work. Thus, the Appeals Council ruled that additional development would be needed to reevaluate the physical, mental and skill requirements of White's past relevant work under the guidelines. (R. at 80-81.)

[4] The subsequently filed applications are not available as part of the Record in this suit.

-3-

By opinion dated December 24, 2003, the ALJ denied White's claims. (R. at 19-26.) The ALJ found that White met the disability insured status requirements of the Act for disability purposes on March 15, 1998, the date she alleged that she became unable to work, through the date of the ALJ's decision. (R. at 25.) The ALJ also found that White met the requirements for DWIB and that White's prescribed period began February 1, 1993, and ended March 1, 2000.[5] (R. at 25.) In addition, the ALJ determined that White had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 25.) The ALJ found that White suffered from severe impairments, namely degenerative changes of the cervical spine and a slight increased uptake of the right and left acromioclavicular joints, which were secondary to arthritis. (R. at 23, 25.) However, the ALJ concluded that White did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) Furthermore, the ALJ determined that White's allegations regarding her limitations were not totally credible. (R. at 25.) The ALJ found that White possessed the residual functional capacity to perform less than a full range of light work[6] and possessed possible marginal education skills. (R. at 26.) The ALJ also concluded that White was unable to perform any of her past relevant work. (R. at 26.) The ALJ found that, although White was not capable of performing the full range of light work, a significant number of jobs existed in the national economy that White was capable of

---

[5] To qualify for DWIB, an individual must show that she is the widow of a deceased wage earner, has attained age 50, is unmarried (with certain exceptions) and is under a disability which began no later than seven years after the wage earner's death or seven years after she was last entitled to survivor's benefits. *See* 20 C.F.R. § 404.335 (2006).

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

-4-

performing, such as an interviewer, a theater usher, a factory messenger, a product coordinator, a shipping and receiving clerk, a crossing guard, a food prep worker, a production inspector, a grader, a sorter and a nonconstruction laborer. (R. at 26.) Thus, the ALJ concluded that White was not under a disability as defined in the Act and not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his opinion, White pursued her administrative appeals and again sought review of the ALJ's decision by the Appeals Council. (R. at 13-14.) The Appeals Council found no reason under the rules to review the ALJ's decision and denied White's request for review; thereby, making the ALJ's decision the final decision of the Commissioner. (R. at 8-10.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). Thereafter, White filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on White's motion for summary judgment, filed April 19, 2006, and on the Commissioner's motion for summary judgment, filed May 9, 2006.

## II. Facts

White was born in 1949. (R. at 485, 495.) Thus, pursuant to 20 C.F.R. §§ 404.1563(d), 416.963(d), White is classified as a "person closely approaching advanced age." White obtained a ninth-grade education, which is classified as a "limited education" under 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). (R. at 20, 505, 533-34.) She has past relevant work experience as a dump truck driver, a sewing machine operator and as an off-bearer. (R. at 20.) Because White's past relevant

Case 1:05-cv-00090-GMW-PMS   Document 14   Filed 03/08/07   Page 5 of 40   Pageid#: 49

work experience included either unskilled or semiskilled positions, she has no transferable work skills. (R. at 20.)

At White's first hearing before the ALJ on October 1, 1999, she testified that she had been a widow since February 1993. (R. at 504.) White also explained that, at the time of the hearing, she had no income and that she lived with her daughter. (R. at 505.) She stated that she completed the ninth grade in school; however, she indicated that she had to repeat both the fifth and seventh grades. (R. at 505.) White testified that she could read, but that her eyesight made it difficult. (R. at 505.) She further reported that she was able to add and subtract, but that she had previously written bad checks because she did not know how to write a check properly. (R. at 506.) White also testified that she had received "tractor and truck driving training." (R. at 506.)

White was asked about her work experience and the types of jobs she had performed. (R. at 507.) She explained that her previous employment required her to stack boards. (R. at 507.) She testified that this particular job lasted for approximately six months to one year. (R. at 507.) White stated that the heaviest thing she had to lift weighed about 85 pounds. (R. at 508.) She also stated that she was required to stand the majority of the time; sometimes for more than eight hours. (R. at 508.) In addition, White testified that she performed steel work, where she was required to "lift[] crank cases . . . off the pallets, and put them onto the sizing table." (R. at 508.) She explained that the items she lifted weighed between 25 and 50 pounds. (R. at 508.) White testified that this job required constant standing, except for breaks. (R. at 508.) White claimed that she worked this particular job for nearly

two years. (R. at 508.) Moreover, White testified that she worked for a short time as a sewing machine operator. (R. at 509.) White testified further as to past employment that required her to lift heavy boxes, each of which weighed approximately 75 to 80 pounds. (R. at 509.) White noted that she worked at another job, which required her to stack boards that weighed 25 to 50 pounds. (R. at 510.) Lastly, White testified that she worked as a truck driver for nearly two years. (R. at 510.)

White testified that problems such as dizziness, lower back pain, neck pain and arthritis in her hands, kept her from working. (R. at 511.) She explained that her back pain originates in the upper part of her back, and when she was "standing or anything . . . it'll run up in the back of [her] head, behind [her] ear . . . and it causes [her] to pass out." (R. at 512.) Furthermore, White described the discomfort as a sharp pain that radiated into her legs and up and down her right side. (R. at 512.) She explained that her legs hurt constantly and that she had cramps or muscle spasms two to three times per month. (R. at 512.) White noted that her legs often became numb or started tingling, and that she was unable to sit for an extended period without discomfort. (R. at 512.)

White also testified that she would become dizzy upon standing. (R. at 513.) She explained that the dizziness was the result of a pinched nerve in her neck and lower back. (R. at 513.) White stated that she had been prescribed pain medication to treat the pain, and that she usually took the medication at least twice a day. (R. at 513.) She testified that, in order to treat her pain, she also took Tylenol and a hot bath. (R. at 514.) In addition, White testified that she usually lies down for

-7-

approximately four to five hours per day. (R. at 514.) White also noted that she used a heating pad about one time per day and used an ointment to treat her pain at night. (R. at 514.) She further explained that she had to lie on the floor two to three times per week, but that she needed assistance to get up off of the floor. (R. at 515.)

White also testified that her left leg had given out on her. (R. at 515-16.) She noted that her left leg stayed swollen around the knee area and that she also had problems with pain and swelling to her right foot. (R. at 516.) White stated that when she sat for an extended time she had to elevate her feet. (R. at 516.) She explained that she normally sat for two to three hours per day with her legs elevated. (R. at 516.) Additionally, White commented that she suffered from arthritis in her hands and fingers. (R. at 516.) She claimed that the arthritis affected her grip and prohibited her from operating a vehicle. (R. at 517.) She stated that she was prescribed Relafen for the arthritis, but it caused her to become dizzy. (R. at 517.)

White testified that she was "shakier than [she] used to be" and that she had to take medication for her nerves and panic attacks. (R. at 518.) She also testified that when she was upset, she would "get real dizzy and about pass out . . . pain [would go] up through [her] neck . . . and [she would] get real nervous." (R. at 518.) She explained that this pain caused her to cry and that she experienced these situations "pretty often." (R. at 518.) White commented that two or three times per day she would get really upset. (R. at 518.) White reported that she did not rest well at night because she was unable to sleep due to back pain. (R. at 519.) She also noted that she suffered from hemorrhoids. (R. at 521.)

-8-

White also was asked how the death of her grandson son had affected her. (R. at 519.) She stated that she would prefer not to discuss it, but noted that it "took a toll" on her and had affected her mental health. (R. at 519.) She explained that she had sought mental health treatment and that, at the time of the hearing, she remained in treatment. (R. at 519.)

White testified that she usually awakes at six o'clock in the morning. (R. at 521.) After staying up for a short time, White noted that she would then lie back down and sleep until 12 or 1 p.m. (R. at 521.) White reported that she spent her days watching television. (R. at 521.) She no longer does housework or drives. (R. at 521.) White testified that her daughter took care of the housework and yard work. (R. at 521-22.)

Norman Hankins, a vocational expert, also testified at the October 1, 1999, hearing. (R. at 523-27.) Hankins was asked to describe White's past relevant work. (R. at 524.) He noted that White had experience as a board or lumber stacker, which qualified as unskilled work that required medium exertion and occasional heavy lifting. (R. at 524.) He also explained that her past work as a dump truck driver qualified as semiskilled work that required medium exertion. (R. at 524.) Furthermore, Hankins reported that White's work as a sewing machine operator was an unskilled position that required light exertion. (R. at 524.) Hankins opined that White did not have any transferable skills. (R. at 525.)

Next, Hankins was asked a number of hypothetical questions by the ALJ. (R. at 525.) The ALJ asked Hankins to consider a hypothetical claimant who was 50

-9-

years old, possessed a ninth-grade education and had the same past relevant work experience as White. (R. at 525.) Hankins was also asked to assume that the individual possessed the physical limitations set forth in Exhibit 7F,[7] which was a physical residual functional capacity assessment completed by an agency physician. (R. at 525.) Hankins explained that, based upon the limitations set forth in Exhibit 7F, the individual would be capable of performing work within the medium exertion category. (R. at 525.) Hankins explained that there were jobs existing in significant numbers within the regional and national economy within this category, such as a dump truck driver, a sewing machine operator, a hand packer, a laundry worker, a maid, a food services worker, off-bearing work and material handling work in factories. (R. at 525-26.)

Hankins was then asked to assume that, in addition to the facts from the first hypothetical, the claimant possessed the nonexertional limitations set forth in Exhibit 8F.[8] (R. at 526.) Hankins opined that the limitations outlined in Exhibit 8F would not have an impact on the jobs identified in the first hypothetical. (R. at 526.) Lastly, Hankins was asked to assume that the hypothetical claimant had the same age, educational background and past relevant work experience as White. (R. at 526.) In addition, Hankins was to accept White's testimony as credible and reliable. (R. at 526.) Based upon this hypothetical, Hankins opined that White would qualify for less

---

[7] Exhibit 7F refers to a residual function capacity assessment form, ("PRFC"), which was completed by Dr. Richard M. Surrusco, M.D., on November 20, 1998. (R. at 208-15.) Dr. Surrusco's findings were reviewed and affirmed by Dr. Frank M. Johnson, M.D. (R. at 215.)

[8] Exhibit 8F refers to a psychological report and a Medical Assessment of Ability To Do Work-Related Activities (Mental) completed by Michael Kleinot, Ph.D., on July 22, 1999. (R. at 217-25.)

-10-

than sedentary work, and with the limitations she described, there would be no jobs that she would be capable of performing. (R. at 526-27.) At the conclusion of the hearing, the ALJ allowed the record to remain open for 30 days to allow White to present further evidence. (R. at 527-28.)

A second hearing was held before the ALJ on October 27, 2003. (R. at 529-51.) White testified that she was unable to properly balance her checkbook and that her daughter now took care of that for her. (R. at 534.) White reiterated much of the testimony she offered at the first hearing and described her past relevant work. (R. at 534-37.) She explained that her work as a dump truck driver required her to change flat tires when they occurred, and that the tires weighed approximately 200 pounds. (R. at 537.) She also indicated that she had worked for a short time at a fast food restaurant, where she was required to stand for eight hours per day. (R. at 538.)

White testified that her doctor had informed her that she suffered from osteoarthritis, and that the pain caused her to become dizzy. (R. at 538.) She stated that she experienced this pain "about everyday." (R. at 538.) She also noted that bending, squatting and stooping caused her pain to increase. (R. at 538.) White explained that her doctors thought that she might have had a blood clot in her right leg. (R. at 539.) Apparently, her doctors thought that her cholesterol could have caused the problems; thus, she was prescribed cholesterol medication. (R. at 539.) However, White stated that the medication caused her throat to swell and she was unable to continue with the medication. (R. at 539.) She noted that her right leg has improved. (R. at 539.)

-11-

White also explained that she was prescribed medication for hypertension. (R. at 539.) White testified that she suffered from breathing problems as well, which her doctors felt resulted from angina and/or anxiety attacks. (R. at 540.) She also reported that she suffered from a thyroid problem. (R. at 540.) She testified that her throat swelled and that she experienced pain near her ear. (R. at 540.) White stated that she constantly felt tired. (R. at 540.) In addition, White commented that she had a stomach condition that required her to take Zantac. (R. at 541.) Furthermore, White stated that she also had been prescribed Xanax. (R. at 541.) She explained that these medications all caused dizziness, and that some have caused rectal bleeding. (R. at 542.)

White testified that she often felt worthless and useless. (R. at 542.) Moreover, she indicated that she suffered from crying spells, especially when she was around people or crowds. (R. at 542.) White acknowledged that she was treated by a counselor in 1999, who rated her functional level very low. (R. at 543.) White indicated that her condition had worsened since then. (R. at 543.)

White explained that she spent her days sitting and watching television. (R. at 543.) She stated that she was unable to sit for extended periods and that she was unable to do household chores. (R. at 543.) She testified that she was angry "all the time." (R. at 543.) White reported that she often yelled or screamed because her children and grandchildren made her nervous when they visited. (R. at 544.) She also explained that she did not cook; she indicated that she would occasionally make a sandwich, but that her daughter took care of all the cooking. (R. at 544.) Furthermore, White commented that her daughter also did the shopping. (R. at 544.)

-12-

Robert Spangler, a vocational expert, also testified at the second hearing. (R. at 545-50.) Spangler was asked to describe White's past relevant work. (R. at 546.) Spangler testified that her employment as a dump truck driver was medium to heavy,[9] semiskilled work, with no transferable skills, her employment as a sewing machine operator qualified as light to medium, semiskilled work, with no transferable skills and her other jobs as an off-bearer qualified as medium to heavy, unskilled work, with no transferable skills. (R. at 546.)

The ALJ then asked Spangler to consider a series of hypothetical questions. (R. at 547-50.) The ALJ asked Spangler to assume a hypothetical individual of the same age, educational background and past relevant work experience as White. (R. at 547.) In addition, he asked Spangler to assume that the hypothetical individual possessed the exertional limitations as set forth in Exhibit 20F,[10] which was a PRFC completed by an agency physician. (R. at 547.) Spangler opined that, based upon the limitations presented, the hypothetical claimant would be capable of performing less than a full range of light work. (R. at 547.) He further explained that there were jobs existing within the national economy that a person with the described limitations could perform, such as an interviewer, a theater usher, a factory messenger, a production coordinator, a shipping and receiving clerk, a crossing guard, a production inspector, a grader, a sorter, a nonconstruction laborer and certain food preparation

---

[9] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, she can also perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2006).

[10] Exhibit 20F refers to PRFC, which was completed by Dr. Richard M. Surrusco, M.D., on May 9, 2002. (R. at 377-84.)

-13-

positions.  (R. at 547-48.)

Spangler was then asked to assume that, in addition to the facts presented in the first hypothetical, the individual had the nonexertional limitations as set forth in Exhibit 21F,[11] which was a Psychiatric Review Technique form, ("PRTF"), completed by an agency physician.  (R. at 548.)  Based upon those limitations, Spangler determined the individual would be reduced from a limited education to a marginal education. (R. at 548.)  He explained that there would be approximately 9,125 light to marginal jobs in this region, such as occupations in personal service, a demonstrator, a grader, a sorter, a nonconstruction laborer, a production machine tender and a production inspector.  (R. at 548-49.)  The ALJ also asked Spangler to consider the limitations set for in Exhibit 25F,[12] which was a psychological report regarding White.  (R. at 549.)  Spangler explained that these limitations would not alter his opinion.  (R. at 549.)

Lastly, the ALJ asked Spangler to assume the facts and limitations set forth in the previous hypotheticals, and to assume that White's testimony was credible and reliable.  (R. at 550.)  Spangler opined that, if her testimony were true, White would be capable of performing less than a full range of sedentary work; thus, he explained that there would be no jobs available.  (R. at 550.)  At the conclusion of the hearing, the ALJ noted that the record would be left open for 30 days so that White could

_____

[11] Exhibit 21F refers to a Psychiatric Review Technique form, ("PRTF"), which was completed by Hugh Tenison, Ph.D., on June 7, 2002.  (R. at 385-99.)

[12] Exhibit 25F refers to a psychology report conducted by Michael Kleinot, Ph.D., on July 25, 2003.  (R. at 406-15.)

-14-

present additional evidence. (R. at 550-51.)

In rendering his decision, the ALJ reviewed records from Dr. John Testerman, M.D.; Dr. Brad Beeson, M.D.; Bristol Regional Medical Center, ("BRMC"); Johnston Memorial Hospital, ("JHM"); Mountain Spring Family Care, Dr. Darlene B. Litton, M.D.; Michael Kleinot, Ph.D.; Dr. Roger D. Neal, M.D.; Saltville Medical Center, ("SMC"); Smyth County Community Hospital, ("SCCH"); Highlands Community Services-Counseling Center, ("HCS"); Dr. Douglas P. Williams, M.D.; Dr. Matthew D. Beasey, M.D.; Dr. J. Mark Woodard, M.D.; Dr. Deborah Weddington, M.D.; Dr. Gary Parrish, M.D.; Dr. Richard M. Surrusco, M.D.; R. J. Milan, Jr., Ph.D.; Hugh Tenison, Ph.D.; Norman Hankins, a vocational expert; and Robert Spangler, a vocational expert.

On March 10, 1997, White presented to Dr. John Testerman, M.D. (R. at 154.) White was referred to Dr. Testerman by Dr. Brad Beeson, M.D., following a 1996 car accident. (R. at 154.) White complained that she began experiencing pain approximately three days after the car accident. (R. at 154.) A physical examination revealed tenderness at the "nuchal ridge and just inferior to this with marked trigger point formation bilaterally, worse on left than right." (R. at 154.) Dr. Testerman noted that White had a full range of motion of the cervical spine without any significant decrease. (R. at 154.) In addition, Dr. Testerman reported that forward flexion was full and that extension lateral flexion to the right or left did not present any radicular type of signs. (R. at 154.) X-rays of the cervical spined showed some degenerative disc disease at C6-C7, with anterior calcification, which antedated the car accident. (R. at 154.) Dr. Testerman also noted that odontoid views did not

-15-

indicate any evidence of fracture, and that he did not see any evidence of ring fracture that could cause occipital nerve symptoms. (R. at 154.) Dr. Testerman diagnosed White's pain as an occipital neuralgia secondary to compression by the muscles injured in the car accident; thus, White was scheduled for occipital nerve block treatment. (R. at 154.)

White sought treatment from Dr. Beeson from May 16, 1997, to May 31, 1997, and complained of neck and back pain, numbness, severe headaches and muscle spasms to the right side of her face. (R. at 155-56.) On June 2, 1997, a left shoulder x-ray was negative for acute injury or dislocation. (R. at 158.) However, a small calcific density was found at the tendon attachment superolateral aspect of the head of the humerus, which was compatible with the residual effect of calcific tendinitis. (R. at 158.) In addition, a large calcification adjacent to the aortic arch was found, which was determined to be a residual of old granulomatous disease of the chest. (R. at 158.)

On May 24, 1997, White presented to the emergency room at BRMC. (R. at 159-73.) White indicated that she had been dizzy for several days and that she experienced a spinning sensation. (R. at 160.) She also noted that she had blacked out on a couple of occasions and had difficulty walking. (R. at 160.) White presented with symptoms of swelling in her hands and face, and also described a feeling of fullness in her face. (R. at 160.) She also complained of back and leg pain, which derived from her previous car accident. (R. at 160.) Upon examination, Dr. Charles Fulton, M.D., reported that White was very anxious and that she was crying. (R. at 160.) He noted that her extremities showed no cyanosis, edema or clubbing.

-16-

(R. at 160.) Furthermore, Dr. Fulton found White's grip strengths to be bilaterally equal, the cranial nerves II-XII to be grossly intact and her Babinski's to be negative. (R. at 160.) Medical records indicate that, during the course of treatment, White was given Diazepam and her affect improved, as did her symptoms. (R. at 161.) White was diagnosed with vertigo, edema, anxiety and chronic neck and back pain. (R. at 161.) White was prescribed Meclizine and instructed to rest for two to three days, and also was cautioned not to drive, swim, climb or operate machinery until her dizziness had stopped. (R. at 161.)

White again presented to BRMC on August 19, 1997. (R. at 174-84.) White complained of dizziness and a dull, pressure-type pain to the left side of her chest. (R. at 175.) She also indicated that she experienced palpitations and pain in the left arm. (R. at 175.) White also stated that her ears felt congested and that she had a sore throat. (R. at 175.) Upon examination, it was noted that White's neck was supple with good range of motion. (R. at 176.) A portable chest x-ray showed no acute changes. (R. at 176.) An electrocardiogram, ("EKG"), revealed normal sinus rhythm, with no acute changes. (R. at 176.) A radiology report again acknowledged the presence of a calcified node in the aorticopulmonary, but also stated that White's lungs were clear and that no acute cardiopulmonary abnormality was identified. (R. at 181.) Dr. Greg Gerlock, M.D., noted chest wall pain and anxiety. (R. at 176.) He prescribed Anaprox, and instructed White to rest and to follow up with her regular physician. (R. at 176.)

On August 29, 1998, White was admitted to the JMH emergency room. (R. at 185-92.) White complained of chest pain to her left side, left arm pain and pain to

-17-

the left side of her face. (R. at 185.) She also claimed that her face felt swollen and drawn. (R. at 185.) She was diagnosed with chest pain and chest-wall pain. (R. at 185.) An x-ray showed that White's lungs were clear, vascularity was normal and that her heart was in the upper limits of normal size. (R. at 186.) White was prescribed Darvocet for pain. (R. at 290.) White presented to JMH again on February 1, 2001, with complaints of weakness, dizziness, nausea and back pain. (R. at 341, 443.) An x-ray of the lumbar spine was normal, and no acute fractures were noted. (R. at 344, 446.) On November 29, 2001, White underwent an x-ray, which indicated diffuse polyarticular arthritis. (R. at 480.) The x-ray show increased activity in the right AC joint and a slightly increased uptake in the left knee laterally, both of which were probably secondary to arthritis. (R. at 480.) The medical records indicate that the x-ray showed an otherwise normal whole body bone scan. (R. at 480.)

White sought treatment and evaluation from Mountain Spring Family Care from September 1998 to November 1998. (R. at 193-207.) Specifically, White was treated by Dr. Darlene B. Litton, M.D. White presented with symptoms of dizzy spells, numbness and swelling in her hands, body aches, neck pain and back pain. (R. at 194-97.) On October 2, 1998, medical records noted that White was not in acute distress. (R. at 196.) Furthermore, after reviewing White's lumbar spine and cervical spine films, there appeared to be some disc narrowing in the cervical spine. (R. at 196.) A Magnetic Resonance Image, ("MRI"), was ordered by Dr. Litton on October 15, 1998. (R. at 200.) The MRI results were normal and indicated no evidence of significant spondylosis, disc protrusion or disc extrusion. (R. at 200.) In addition, no cord compromise or foraminal narrowing was identified; however, a mild facet

-18-

change was present. (R. at 200.)

A PRFC was completed by Dr. Surrusco, a state agency physician, on November 20, 1998. (R. at 208-215.) Dr. Surrusco found that White was able to lift and/or carry items weighing up to 50 pounds occasionally, 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that she was unlimited in her ability to push and/or pull. (R. at 209.) In addition, no postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 210-12.) Dr. Surrusco's findings were reviewed and affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on March 15, 1999. (R. at 215.)

On July 22, 1999, White was examined by Michael Kleinot, Ph. D. (R. at 217-25.) Kleinot administered the Weschsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), to White. (R. at 217-221.) White received a verbal IQ score of 56, a performance IQ score of 57 and a full-scale IQ score of 52. (R. at 220.) However, Kleinot considered the results of the test to be invalid due to the fact that he believed White was malingering. (R. at 220.) Kleinot noted that, during the evaluation, White walked normally and displayed no evidence of physical discomfort. (R. at 218.) He indicated that White was not fully cooperative and that she "steadily malingered" throughout the testing procedures. (R. at 218.) Kleinot also reported that White displayed a significant tendency toward passive-aggressive and oppositional personality dysfunction. (R. at 218.)

The suspicions of malingering first arose when White stated that two plus one

equaled four, that six plus two equaled nine and when she spelled the word "cat" with a "K." (R. at 218.) Kleinot remarked that her behavior "was entirely consistent with malingering, leaving no question . . . [thus, he found that] her behavior rendered [the] test results invalid." (R. at 219.) However, Kleinot did note that White was likely below the average level of intelligence. (R. at 219.) Kleinot explained that White exhibited a normal affect and appropriate mood during the examination. (R. at 219.) He also observed no signs of anxiety. (R. at 219.) Moreover, he opined that White did not seem to be particularly depressed. (R. at 219.) Kleinot reported that there seemed to be indications of long-standing personality dysfunction and a poor adult adjustment in her community. (R. at 219-20.) He also observed that White had no motivation for employment, and that, based upon her history, she would likely prove to be an accident-prone individual in the workplace. (R. at 220.) Kleinot concluded that White was probably of below average intelligence, within the upper half of the borderline range of intellectual functioning; however, he noted that this could not be determined because of White's constant malingering. (R. at 221.) Furthermore, Kleinot opined that available information suggested diagnostic impressions of malingering, ruled out borderline intellectual functioning, personality disorder not otherwise specified and dysthymic disorder. (R. at 221.)

Kleinot also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental). (R. at 223-26.) Kleinot determined that White had good ability to follow work rules, interact with supervisors and function independently. (R. at 223-24.) White also was found to have fair ability to relate to co-workers, deal with the public, use her judgment, deal with work stresses and maintain attention/concentration. (R. at 223-24.) Kleinot found that White had no useful

ability to understand, remember and carry out complex job instructions, a fair ability to understand, remember and carry out detailed instructions and a good ability to understand, remember and carry out simple job instructions. (R. at 224.) Moreover, Kleinot indicated that White had fair ability to maintain personal appearance, to behave in an emotionally stable manner and demonstrate reliability. (R. at 224.) White was found to have good ability to relate predictably in social situations. (R. at 224.) Lastly, Kleinot determined that White possessed the ability to manage benefits in her best interest. (R. at 225.)

White sought treatment at Saltville Medical Center, ("SMC"), from April 23, 1997, to September 9, 2002. (R. at 229-53.) In September of 1999, White presented with complaints of rectal pain and bleeding, burning during urination, bleeding after urination and hemorrhoids. (R. at 248.) White was referred to a surgeon in Marion, Virginia, for evaluation and treatment. (R. at 248.) The medical records indicate that White was advised to continue taking Zoloft because she had severe anxiety and depression, and because she reported a history of panic attacks. (R. at 248.) White returned to SMC with complaints of rectal pain and vomiting, as well as anxiety and depression. (R. at 247.) The treating physician, Dr. Deborah Weddington, M.D., noted that she was unable to get a good abdominal exam because White moaned and cried loudly upon touch; thus, White was instructed to go to the emergency room immediately for evaluation of possible acute abdominal pain. (R. at 247.) Dr. Weddington also noted that White asked her to fill out a statement for disability. (R. at 247.) As a result, Dr. Weddington expressed concern as to White's motivation for treatment. (R. at 247.) In addition, Dr. Weddington advised White that if her rectal fissure continued to bother her, that she should discuss the possibility of surgical

-21-

correction. (R. at 247.)

In November 1999, White again presented to SMC, complaining of vomiting, pain in the pelvic area and multiple somatic complaints. (R. at 246.) White was treated for gastroesophageal reflux disease, ("GERD"), symptoms with Tagamet. (R. at 246.) Likewise, in December 1999, White complained of right-sided abdominal pain. (R. at 245.) Dr. Weddington noted that White had "all sorts of bizarre beliefs" about her pain, including the possibility that there was something inside her that was causing an infection. (R. at 245.) Once again, White complained of nausea, vomiting and diarrhea. (R. at 245.) The medical records demonstrate that White had failed to properly take her thyroid medication; thus, Dr. Weddington wrote her a new prescription and informed her that "under no circumstances" was she to be without her thyroid medication. (R. at 245.)

In November of 2000, White visited SMC for a routine check-up. (R. at 243.) White informed the physician that she had stopped taking her medication because it upset her stomach. (R. at 243.) However, the medical records indicated that White had caused the stomach problems by systematically stopping the medication. (R. at 243.) White stated that she was experiencing dizziness, as well as pelvic, back, leg and hip pain. (R. at 243.) She also noted problems with arthritis, hemorrhoids and an anal fissure. (R. at 243.) White stated that she did not want to continue taking Zoloft, and noted no depression at the time of this visit. (R. at 243.) Medical records also reported that White's hip and back pain were probably due to arthritis and because she was postmenopausal. (R. at 242.) In addition, her dizziness was attributed to her psychological issues of anxiety and depression. (R. at 242.)

-22-

However, White laughed and stated that the anxiety and depression was "not really that big of a problem" and that she could live with it. (R. at 242.)

On August 30, 2001, White presented to SMC with pain in the right side of her neck and in her right thumb. (R. at 238.) She also stated that, the day prior to the visit, she also had experienced some numbness in her right arm. (R. at 238.) However, on the day of the visit, she denied any numbness, tingling or change in the strength of her arms or legs. (R. at 238.) The medical records demonstrated that White was able to move her neck to the right without discomfort; but, moving it to the left seemed to be uncomfortable. (R. at 238.) There was no bruising or swelling to the right finger noted, but there was mild tenderness upon palpation of the MCP joint. (R. at 238.) White's complaints were attributed to muscle spasms and arthritis. (R. at 238.) On September 13, 2001, White reported that her neck was doing much better and she was able to move it in all directions. (R. at 238.) An x-ray was taken of the right thumb, which indicated spurring. (R. at 238.) No bruising or deformity was noted. (R. at 238.) White was prescribed Vioxx. (R. at 238.)

On November 27, 2002, White sought treatment at SMC complaining of pain in her right thumb, right knee and tailbone. (R. at 235.) White also reported persistent pelvic pain and right lower quad pain; a pelvic ultrasound revealed a slightly enlarged uterus with a large fibroid. (R. at 235.) The records show that White did have a right, first trigger finger with locking of the DIP joint, as well as tenderness to palpation over the right medial knee, with mild crepitus on flexion and extension of the right leg at the knee. (R. at 235.) Her motor exams were grossly normal in both upper and lower extremities. (R. at 235.) She was found to have

-23-

polyarticular arthritis, or diffuse bone pain, in her right, first trigger finger. (R. at 235.)

White presented to the SCCH emergency room on April 2, 1998. White claimed that she had fallen and injured her left ankle. (R. at 287.) An x-ray showed no fracture or destructive lesion. (R. at 287.) White was admitted to SCCH on February 1, 2000, for outpatient treatment. (R. at 325.) The medical records indicated that White had a left lateral anal fissure with associated polypoid hemorrhoid, hypertension and possible hypothyroidism. (R. at 325.) The scheduled plan was to perform a limited hemorrhoidectomy and fissurectomy, with possible partial sphincterotomy. (R. at 326.) However, based upon the record, it is unclear if this procedure was completed.

White received treatment at HCS from April 2, 1999, to October 27, 1999. (R. at 292-324.) White complained of severe depression and anxiety. (R. at 318.) She also noted that she suffered from arthritis and high blood pressure. (R. at 318.) During an evaluation, White was found to be in moderate distress with slow motor activity, but she was cooperative, frank and responsible. (R. at 322.) White also was found to be oriented as to person, place and time, with slightly impaired attention and concentration. (R. at 322.) Furthermore, White's intelligence level was estimated to be in the low average category. (R. at 322.) Her insight, memory and judgment were reported to be intact. (R. at 322.) White's thought process was said to flow smoothly, with no indication of suicidal or homicidal ideation. (R. at 322.) White's predominant mood during the interview was of depression. (R. at 322.) She was diagnosed with major depression dysthymic. (R. at 323.) In addition, it was noted

that her symptoms could affect her activities of daily living and could lead to trouble socializing with others. (R. at 323.)

During her visits to HCS, White reported intense sadness due to her grandson's death. (R. at 301, 309, 313.) On April 15, 1999, White complained of tiredness, too much sleep, weight gain, crying spells and poor concentration. (R. at 315.) It was again noted that White suffered from major depression dysthymic. (R. at 315.) On April 2, 1999, and April 15, 1999, White's Global Assessment of Functioning,[13] ("GAF"), score was 48. (R. at 315, 323.) Shortly thereafter, on May 4, 1999, White's GAF score had improved to 54. (R. at 310.) Then, on August 6, 1999, White's GAF score again improved to 55. (R. at 305.) White's thought process was referred to as logical and goal directed; however, her intelligence was categorized as low average. (R. at 304.) White was diagnosed with depressive disorder, not otherwise specified, panic disorder with agrophobia and psychosocial stressors. (R. at 304-05.) Moreover, mood disorder and hypothyroidism were ruled out. (R. at 304.)

On May 2, 2002, White presented to Dr. Roger D. Neal, M.D. (R. at 227.) White complained of right ear pain and explained that her ear felt like it was stopped up or congested. (R. at 227.) An examination showed that the ear canal was clear, but Dr. Neal reported eustachian tube dysfunction of the right ear. (R. at 227.) White

---

[13] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 41-50 indicates "[s]erious symptoms OR any serious impairment insocial, occupational, or school functioning." DSM-IV at 32. A GAF score of 51-60 indicates "[m]oderate symptoms OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32.

was prescribed Rhinocort. (R. at 227.)

A PRFC was completed by Dr. Surrusco on May 9, 2002. (R. at 377-84.) Dr. Surrusco determined that White could lift and/or carry items weighing up to 20 pounds occasionally, items weighing up to 10 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that her ability to push and/or pull was limited in her lower extremities. (R. at 378.) Dr. Surrusco found that White had no postural, visual or communicative limitations. (R. at 380-81.) It also appears that Dr. Surrusco found that White had no manipulative limitations; however, the box referencing the ability to reach in all directions seems to be marked as both limited and unlimited. (R. at 380.) In addition, Dr. Surrusco noted no environmental limitations, except that White should avoid all exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 382.) This assessment was affirmed by Dr. Gary Parrish, M.D., on November 26, 2002. (R. at 384.)

A PRTF was completed by Hugh Tenison, Ph.D., a state agency physician, on June 7, 2002. (R. at 385-99.) Tension concluded that White's impairment was not severe, and also noted a coexisting nonmental impairment that required referral to another medical specialty. (R. at 385.) Additionally, Tenison noted that a medically determinable impairment was present that did not precisely satisfy the diagnostic criteria for affective disorders or anxiety related disorders. (R. at 388, 390.) However, Tenison reported that there were indications of depression and anxiety. (R. at 388-90.) Lastly, Tenison found that White was mildly limited in her restriction of activities of daily living, noting difficulties in maintaining social functioning,

-26-

maintaining concentration, persistence or pace, and that she experienced no episodes of decompensation. (R. at 395.) Tenison's assessment was reviewed and affirmed by R. J. Milan, Jr., Ph. D., another state agency physician, on November 25, 2002. (R. at 385.)

On July 9, 2002, Dr. Douglas P. Williams, M.D., saw White regarding the dizziness she had experienced. (R. at 400.) Upon examination, Dr. Williams stated that White had a positive Nylen Barany test in the right ear down, as well as the left ear down position, especially when she returned to the upright position. (R. at 400.) He also indicated that there seemed to be tearing on the tympanic membrane. (R. at 400.) Dr. Williams noted that White had peripheral vestibulopathy, which was likely more in the right ear than the left, but it could possibly be bilateral. (R. at 400.) Dr. Williams prescribed White with Phenergan and also taught her positional therapy exercises to assist in the relief of her symptoms. (R. at 400.)

On September 4, 2002, White was referred to Dr. Matthew D. Beasey, M.D., for an endocrine consultation. (R. at 402-03.) Dr. Beasey noted that White had a history of a mild toxic multinodular goiter; thus, he ordered further thyroid labs and antithyroid antibodies. (R. at 402-03.) He indicated that White would certainly feel better when her thyroid gland is normally functioning, but also explained that it would not take care of all of her problems. (R. at 403.)

On January 24, 2003, White was treated at SMC. (R. at 471.) White complained of left-sided chest pain, left arm numbness and tingling. (R. at 471.) White also reported that she had experienced numbness in her hands and episodes of

dizziness. (R. at 471.) In addition, White noted that her acid reflux symptoms had increased. (R. at 471.) White explained that her depression had increased and that she wanted to resume taking Zoloft. (R. at 471.) She was found to be suffering from GERD, allergic rhinitis and depression. (R. at 471.) White was prescribed Zoloft, Zantac and Nasonex. (R. at 471.)

White presented to BRMC on February 14, 2003, primarily complaining of left knee pain and numbness to the left side of her body. (R. at 458.) The emergency room records showed that a CT scan of her head was normal, and White was diagnosed with a transient ischemic attack. (R. at 457.) After being admitted for overnight observation, White was discharged on February 15, 2003, and was instructed to follow up with Dr. Weddington in seven to 10 days. (R. at 450.)

White then followed up with Dr. Weddington at SMC on February 21, 2003. (R. at 470.) Prior to her follow up appointment, White underwent an outpatient exercise stress test. (R. at 470.) Then, on March 13, 2003, White presented to SMC and noted occasional substernal chest pains, which she stated was relieved when she belched. (R. at 469.) The results of her stress test also were reviewed on this date; however, the test was inconclusive, showing normal blood pressure response to stress with mild ST changes in the inferior leads. (R. at 469.) During the visit, White complained of upper respiratory type symptoms, including right ear pain, with decreased hearing, nasal congestion, purulent postnasal drainage and occasional nonproduction coughing at night. (R. at 469.) The medical records show that White was diagnosed with acute sinusitis and prescribed Amoxicillin. (R. at 469.)

On July 25, 2003, Michael Kleinot, Ph.D., reevaluated White and compiled a psychology report. (R. at 406-15.) Because White had seemingly malingered during Kleinot's July 1999 evaluation, he reminded White that the evaluation process was voluntary in an attempt to engage her in a productive manner. (R. at 407.) Kleinot noted that White walked normally and displayed no evidence of physical discomfort. (R. at 408.) However, Kleinot did mention that White complained of back discomfort once the interview was completed. (R. at 408.) Kleinot opined that White was probably of below average intelligence, with an estimated IQ score of 80. (R. at 408.) Kleinot observed no signs of a thought disorder. (R. at 408.) He also reported that White's affect was normal, but her mood was somewhat irritable. (R. at 409.) Furthermore, Kleinot opined that, based upon White's demeanor, she seemed more vulnerable to anger problems than to emotional problems such as depression or anxiety. (R. at 409.) Kleinot noted that White seemed to have some dysfunctional aspects to her personality. (R. at 409.) He also opined that White may have some independent affective disorder; however, this disorder did not appear to represent a mental disorder that would involve "deterioration of her adjustment with the stressors of employment." (R. at 409.)

Kleinot explained that the administration of the Minnesota Multiphasic Personality Inventory - 2, ("MMPI-2"), was requested; however, Kleinot determined that, because of her behavior, White would not likely produce valid MMPI-2 results. (R. at 410.) In addition, Kleinot explained that the administration of both the MMPI-2 and the Personality Assessment Inventory, ("PAI"), tests would be difficult because he questioned whether or not White read at the requisite reading level. (R. at 410.) Thus, Kleinot determined that he would administer the Miller Forensic Assessment

Case 1:05-cv-00090-GMW-PMS   Document 14   Filed 03/08/07   Page 29 of 40   Pageid#: 73

of Symptoms Test, ("M-FAST"), and the Structured Interview of Reported Symptoms Test, ("SIRS"). (R. at 410.) On the M-FAST, White registered a score of 15. (R. at 410.) A score of six or above suggests malingering behavior; thus, White's score more than doubled the level for malingering behavior. (R. at 410.) These results indicated that White was malingering, or possibly fabricating, symptoms of a major mental disorder. (R. at 410.) According to the M-FAST, it was determined that the probability that White was malingering symptoms of a mental illness was 100 percent. (R. at 410.)

Kleinot noted that the SIRS test is considered to be the most sophisticated and validated instrument available to identify the presence of malingering behavior. (R. at 410.) On the SIRS, White produced three separate scores that were considered to be extremely elevated as to be placed in the "definitely feigning" range. (R. at 410.) Moreover, White produced three other scores that fell within the "probably feigning" range. (R. at 410.) Due to these scores, Kleinot reported that the probability that White malingered was 100 percent. (R. at 411.) Kleinot determined that the available information as to White suggested diagnostic impressions of malingering, borderline intellectual functioning, adult antisocial behavior, and a personality disorder not otherwise specified; in addition, Kleinot ruled out pain disorder, associated with psychological factors and also ruled out dysthymic disorder. (R. at 412.)

Kleinot also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental). (R. at 413-15.) He determined that White had good ability to follow work rules, interact with supervisors, function independently and maintain

-30-

attention/concentration. (R. at 413-14.) Kleinot also found that White possessed fair ability to relate to co-workers, deal with the public, use judgment and deal with work stresses. (R. at 413-14.) White was found to have no useful ability to understand, remember and carry out complex job instructions; however, she was found to have good ability to understand, remember and carry out simple job instructions, and fair ability to understand, remember and carry out detailed job instructions. (R. at 414.) Furthermore, Kleinot reported that White had good ability to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 414.) Kleinot also noted that White had fair ability to maintain personal appearance and demonstrate reliability. (R. at 414.)

On November 28, 2003, Dr. Weddington performed a Physical Capabilities Evaluation and a Medical Assessment of Ability To Do Work-Related Activities (Mental). (R. at 482-84.) Dr. Weddington determined that White was capable of sitting for two hours, walking for two hours and standing for two hours during an eight-hour workday. (R. at 482.) However, Dr. Weddington also found that White was not capable for sitting, standing or walking for one full hour at a time. (R. at 482.) Dr. Weddington found that White could frequently lift and/or carry up to five pounds, occasionally lift items weighing up to 20 pounds and never lift items weighing more than 20 pounds. (R. at 482.) It was also determined that White was not capable of using her hand for repetitive action, such as simple grasping or pushing/pulling of arm controls. (R. at 482.) However, Dr. Weddington did find that White was capable of using her hands for fine manipulation. (R. at 482.) Dr. Weddington found that White could not use her feet for repetitive movements, such as in the pushing/pulling of leg controls. (R. at 482.) White was limited to

-31-

occasional bending and reaching, but was prohibited from squatting, crawling and climbing. (R. at 482.) Dr. Weddington placed moderate restrictions on White's ability to work at unprotected heights and ability to operate automobile equipment. (R. at 482.) In addition, Dr. Weddington placed total restrictions on White's ability to be around moving machinery, to be exposed to dust, fumes and gases and to be exposed to marked changes in temperature and humidity. (R. at 482.)

As to the mental evaluation, Dr. Weddington found that White had either no ability or poor ability in the following areas: to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently and maintain attention/concentration. (R. at 483.) Dr. Weddington noted that White suffered from severe anxiety disorder with panic attacks, as well as depression. (R. at 483.) Furthermore, White was found to be of limited intellectual capacity, with an extremely disorganized thought process. (R. at 483.) Dr. Weddington determined that White possessed fair ability to understand, remember and carry out simple job instructions; however, she also found that White had either no ability or poor ability to understand, remember and carry out complex or detailed job instructions. (R. at 484.) Dr. Weddington found that White had fair ability to maintain personal appearance and either no ability or poor ability to behave in an emotionally stable manner, relate predictably in social situations and to demonstrate reliability. (R. at 484.)

On August 22, 2003, White presented to SMC complaining of right leg pain and swelling. (R. at 467.) White explained that her leg felt as if she had pulled a muscle. (R. at 467.) She stated that this had caused swelling, redness and warmth

-32-

over the lateral aspect of her thigh. (R. at 467.) Furthermore, White claimed that she was having a difficult time bending her knee and flexing her foot, and she also stated that she had experienced swelling in both feet. (R. at 467.) The medical records demonstrate that White's right calf, in comparison to the left, was very edematous, red and warm to the touch over the lateral aspect. (R. at 467.) White was unable to flex her knee more than 90 degrees without severe pain, was ambulating with a limp and had difficultly flexing her foot. (R. at 467.) White was diagnosed with a possible right calf strain and an ultrasound was ordered. (R. at 467.) White was given samples of Bextra and also instructed to take Tylenol, but not Ibuprofen or Aleve. (R. at 467.) Thereafter, on August 25, 2003, White returned to SMC for a follow-up regarding her right leg pain. (R. at 466.) The results of the ultrasound were negative. (R. at 466.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB, SSI and DWIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By opinion dated December 24, 2003, the ALJ denied White's claims. (R. at 19-26.) The ALJ found that White met the disability insured status requirements of the Act for disability purposes on March 15, 1998, the date she alleged that she became unable to work, through the date of the ALJ's decision. (R. at 25.) The ALJ also found that White met the requirements for DWIB and that White's prescribed period began February 1, 1993, and ended March 1, 2000. (R. at 25.) In addition, the ALJ determined that White had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 25.) The ALJ found that White suffered from severe impairments, namely degenerative changes of the cervical spine and a slight increased uptake of the right and left AC joints, which were secondary to arthritis. (R. at 23, 25.) However, the ALJ concluded that White did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) Furthermore, the ALJ determined that White's allegations regarding her limitations were not totally credible. (R. at 25.) The ALJ found that White possessed the residual functional capacity to perform less

-34-

than a full range of light work and possessed possible marginal education skills. (R. at 26.) The ALJ also concluded that White was unable to perform any of her past relevant work. (R. at 26.) The ALJ found that, although White was not capable of performing the full range of light work, there were a significant number of jobs existing in the national economy that White was capable of performing, such as an interviewer, a theater usher, a factory messenger, a product coordinator, a shipping and receiving clerk, a crossing guard, a food prep worker, a production inspector, a grader, a sorter and a nonconstruction laborer. (R. at 26.) Thus, the ALJ concluded that White was not under a disability as defined in the Act and not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

White argues that the ALJ failed to adequately evaluate the evidence within this case. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 3.) Specifically, White argues that the ALJ failed to give any weight to Dr. Weddington's evaluation. (Plaintiff's Brief at 3.) White contends that Dr. Weddington's evaluations were not contradicted by a treating physician; thus, White argues that the ALJ is prohibited from ignoring uncontradicted medical evidence. (Plaintiff's Brief at 4.) White also argues that the ALJ failed to pose a hypothetical containing the exertional limitations noted in Dr. Weddington's evaluation; thus, White contends that the ALJ relied upon answers to hypothetical questions that failed to include all of the facts. (Plaintiff's brief at 6.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that

Case 1:05-cv-00090-GMW-PMS   Document 14   Filed 03/08/07   Page 35 of 40   Pageid#: 79

of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

White's first argument is that the ALJ did not properly evaluate the evidence because he failed to take Dr. Weddington's physical and mental evaluations into consideration. (Plaintiff's Brief at 3.) In fact, White argues that the ALJ failed to even mention Dr. Weddington's evaluations and findings. (Plaintiff's Brief at 3.) White relies upon 20 C.F.R. § 404.1527, which states "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating

-36-

source's opinion." Furthermore, White claims that the ALJ lacks the authority to ignore uncontradicted medical evidence. (Plaintiff's Brief at 4.) Essentially, White argues that the ALJ cannot substitute his opinion for that of a trained medical professional. (Plaintiff's Brief at 5.) *See Wilson v. Heckler*, 743 F.2d 218 (4th Cir. 1984). White asserts that the ALJ simply accepted the opinions of nonexamining physicians, opinions that were in direct conflict with a treating physician, i.e. Dr. Weddington. (Plaintiff's Brief at 5.) White's argument is without merit.

Based upon a review of the record, it appears that the ALJ mistakenly referred to Dr. Weddington as Dr. Litton in his opinion. (R. at 19-26.) This apparent mistake was recognized by White in her brief, as she noted "[i]t is of course possible that the ALJ was mistaken and was referring to the evaluation of Dr. Weddington instead of a statement by Dr. Litton." (Plaintiff's Brief at 5.) It is clear from the record that the ALJ's opinion specifically discussed and rejected the medical evaluations and findings prepared by Dr. Weddington; however, the ALJ mistakenly attributed these evaluations to Dr. Litton. (R. at 24.)

Dr. Weddington administered a Physical Capabilities Evaluation, as well as a Medical Assessment of Ability To Do Work-Related Activities (Mental). (R. at 481-84.) The ALJ chose to reject Dr. Weddington's findings because they were not consistent with the remaining medical evidence. (R. at 24.) Likewise, the ALJ also chose to reject the findings of Dr. Weddington because of psychological evaluations by Kleinot that indicated malingering by White. (R. at 24, 406-15.) In essence, the ALJ determined that Dr. Weddington was misled by White's malingering, and that her evaluations could not be considered valid. (R. at 24.)

-37-

Thus, this court is of the opinion that the ALJ properly considered Dr. Weddington's medical evaluations. The ALJ did not ignore evidence from a treating physician; instead, the ALJ named the wrong doctor within his opinion. Therefore, despite the mistake by the ALJ, the relevant medical evidence was taken into consideration.

White also contends that the ALJ cannot ignore uncontradicted evidence from a treating physician. However, Dr. Weddington's opinions were not uncontradicted. On May 9, 2002, Dr. Surrusco completed a PRFC. (R. at 377-84.) Dr. Surrusco found that White was capable of lifting items weighing up to 10 pounds frequently and items weighing up to 20 pounds occasionally. (R. at 378.) He also found that White was capable of standing and/or walking for a total of six hours in an eight-hour day, and that she could sit for a total of six hours in an eight-hour workday. (R. at 378.) Conversely, Dr. Weddington determined that White could frequently lift items weighing up to five pounds, but that she could only occasionally lift items weighing six to 20 pounds. (R. at 482.) Dr. Weddington also found that White was incapable of sitting, standing or walking for up to an hour at one time, and that she could only sit for two hours, stand for two hours and walk for two hours total during an entire eight-hour day. (R. at 482.) Contrary to White's argument, Dr. Weddington's opinions were contradicted; thus creating a conflict as to the medical evidence. It is the ALJ's duty, and not the duty of the courts, to make findings of fact and to resolve those conflicts in evidence. *See King*, 599 F.2d at 599.

As noted earlier, Dr. Weddington's evaluations were not ignored. Furthermore, it is well-settled that the ALJ is required to consider objective medical facts, medical

-38-

opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. In addition, the ALJ is generally supposed to give more weight to the opinion of a treating physician because a treating physician is more qualified to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). If the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)).

In this case, the medical evaluations of Dr. Weddington seem to be in conflict with the record, especially considering White's questionable credibility. It is readily apparent, based upon the medical records, that White has experienced consistent medical difficulties. However, Dr. Weddington, a treating physician, on September 30, 1999, expressed concern as to White's motivation for treatment because White had asked her to fill out a disability statement. (R. at 247.) Similarly, Dr. Weddington noted that White had "all sorts of bizarre beliefs" as to the causes of her alleged pain, including the possibility that there was something inside her that was causing an infection. (R. at 245.) Thus, based upon Dr. Weddington's concerns, there were obviously some questions as to White's credibility and to the genuineness of her complaints. Just as Dr. Weddington expressed concerns, so did the ALJ in

-39-

rendering his opinion. Based upon the findings of Kleinot, the ALJ found that White's allegations regarding her limitations were not totally credible. (R. at 25.)

In two separate evaluations, Kleinot determined that White was malingering. (R. at 217-225, 406-15.) In July 1999, Kleinot found the results of White's WAIS-II to be invalid because White "steadily malingered." (R. at 218.) White miscalculated simple mathematics questions and misspelled words such as "cat." (R. at 218-19.) In July 2003, Kleinot reevaluated White. (R. at 406-15.) Kleinot administered the M-FAST, which indicated that White's score more than doubled the score indicative of malingering behavior. (R. at 410.) Thus, Kleinot concluded that the M-FAST results demonstrated a 100 percent probability that White was malingering or fabricating symptoms of a major mental disorder. (R. at 410.) Kleinot also administered the SIRS test, which is considered to be the most trustworthy procedure for identifying the presence of malingering behavior. (R. at 410.) White produced three separate scores that were considered to be within the "definitely feigning" range, and produced three other scores that fell within the "probably feigning" range. (R. at 410.) Thus, Kleinot determined that White's probability of malingering was 100 percent. (R. at 411.) Therefore, based upon Kleinot's evaluations, the ALJ found that White's credibility was questionable.

The ALJ has the authority to assess the credibility of a witness or a claimant. *See Hays*, 907 F.2d at 1456. "Because [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shivley v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). This court will not disturb the ALJ's findings as to

-40-

Case 1:05-cv-00090-GMW-PMS   Document 14   Filed 03/08/07   Page 40 of 40   Pageid#: 84